Nellie Earline KUPER, Appellant,

v.

Carl H. KUPER, Appellee.

No. 6966.

Court of Civil Appeals of Texas.

Amarillo.

May 23, 1960.

Rehearing Denied June 20, 1960.

Simpson, Adkins, Fullingim & Hankins, Amarillo, for appellant.

Fike & Hunter, Dalhart, Brown & Brown, Council Grove, Kan., for appellee.

NORTHCUTT, Justice.

This is a suit brought by Nellie Earline Kuper against her former husband, Carl H. Kuper, seeking to vacate and set aside a divorce decree between the parties which was entered on April 22, 1956, insofar as a part of the property settlement was considered; and upon hearing of defendant's motion for summary judgment, Rule 166–A, Texas Rules of Civil Procedure, the same was sustained, with entry of final order that the petitioner take nothing and from that order appellant perfected this appeal. Appellant contended Mr. Kuper practiced fraud upon her as to the value of 2,211 shares of stock.

This appeal is presented upon two assignments of error as follows: First, the trial court erred in granting appellee a summary judgment because appellant in her first amended original petition alleged a cause of action. Second, the trial court erred in granting appellee's summary judgment because the depositions which were taken in the case did not as a matter of law eliminate the fact issue.

We are familiar with the rule involved in a motion for summary judgment where there is a question of fact to be determined and that under those circumstances the summary judgment should be denied. The purposes of the summary judgment rule

is not to decide issues of fact but to ascertain if any genuine issues of fact exist and to eliminate unmeritorious claims and untenable defenses. It is stated in the case of Alexander v. Hagedorn, 148 Tex. 565, 226 S.W.2d 996, 998, by the Supreme Court as follows:

"Although the bill of review is an equitable proceeding, before a litigant can successfully invoke it to set aside a final judgment he must allege and prove: (1) a meritorious defense to the cause of action alleged to support the judgment, (2) which he was prevented from making by the fraud, accident or wrongful act of the opposite party, (3) unmixed with any fault or negligence of his own. Garcia et al. v. Ramos et al., Tex.Civ.App., 208 S.W.2d 111, er. ref. Because it is fundamentally important in the administration of justice that some finality be accorded to judgments, these essentials have been uniformly recognized by our courts; therefore, bills of review seeking relief from judgments 'are always watched by courts of equity with extreme jealousy, and the grounds on which interference will be allowed are narrow and restricted'; and the rules are not to be relaxed merely because it may appear in some particular case that an injustice has been done. Harding v. W. L. Pearson & Co. et al., Tex.Com.App., 48 S.W.2d 964. As said by the Supreme Court of California, 'Endless litigation, in which nothing was ever finally determined, would be worse than occasional miscarriages of justice.' Pico v. Cohn et al., 91 Cal. 129, 25 P. 970, 971, 27 P. 537, 13 L.R.A. 336, 25 Am.St.Rep. 159."

It was further stated in that case as follows:

"Fraud in its relation to attacks on final judgments is either extrinsic or intrinsic. Only extrinsic fraud will entitle a complainant to relief because it is a wrongful act committed 'by the other party to the suit which has prevented the losing party either from knowing about his rights or defenses, or from having a fair opportunity of presenting them upon the trial. Such, for instance, as where he has been misled by his adversary by fraud or deception, did not know of the suit, or was betrayed by his attorney. In other words, fraud which denied him the opportunity to fully litigate upon the trial all the rights or defenses he was entitled to assert. "Intrinsic fraud" in the procurement of a judgment is not ground, however, for vacating such judgment in an independent suit brought for that purpose. And within that term is included such matters as fraudulent instruments, perjured testimony, or any matter which was actually presented to and considered by the trial court in rendering the judgment assailed.' State v. Wright, Tex.Civ. App., 56 S.W.2d 950, 952, which was cited with approval and substantially quoted by this court in Crouch et al. v. McGaw, 134 Tex. 633, 138 S.W.2d 94."

The final judgment of a court having jurisdiction over persons and subject matter can be attacked collaterally in equity after the time for appeal or other direct attack has expired only if extrinsic fraud is alleged. To constitute extrinsic fraud there must have been some representation or concealment by the defendant which prevented the plaintiff from having her day in court. In discussing the rule concerning extrinsic fraud it seems that most all the courts have adopted the statement made by the Supreme Court of the United States in the case of United States v. Throckmorton et al., 98 U.S. 61, 25 L.Ed. 93 where it is stated:

"Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practiced on him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of

the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side. —these, and similar cases which show that there has never been a real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and a fair hearing."

In the case at bar Mr. Kuper originally filed the suit for divorce in Cause No. 4353 and Mrs. Kuper answered and filed a cross action asking that she be granted the divorce. Before the case came on for hearing the parties made and entered into a settlement agreement as to their community property. When the case came on for hearing in the divorce proceedings Mr. Kuper in open court stated that he would not further prosecute his suit for divorce and his suit was dismissed. Thereafter, the case proceeded upon the cross action of Mrs. Kuper and she was granted a divorce from Mr. Kuper and the property settlement was approved by the court in the divorce judgment. In the divorce judgment the 2,211 shares of Rural Life Insurance Company common stock was given to Mr. Kuper as his property. The judgment further provided that any assets not therein described but thereafter discovered should be the joint property of Carl H. Kuper and Nellie Earline Kuper. So, under the provisions of said judgment and the deposition of Mrs. Kuper the only property involved herein is the 2,211 shares of stock mentioned above.

Mrs. Kuper testified in her deposition, which was in the summary judgment hearing, that when Mr. Kuper brought the suit for divorce she started to make some investigation in reference as to the property she and Mr. Kuper owned; that she got Mr. McCrory, former president of the Citizen State Bank at Dalhart, to assist her and that she consulted with him quite often.

She further testified in said deposition that there were several propositions and counter propositions made between them as to the settlement. The following questions and answers were made in the depositions of Mrs. Kuper:

"Q. Who else did you talk to at any time in reference to the value of these insurance stocks? A. Who else did I talk to?

"Q. Yes, if anybody; I mean in Dallas or any place else? A. I talked to a Mr.—I don't remember his name —in Fort Worth, on the telephone, about these stocks.

"Q. Who was that; do you recall? A. I don't remember his name.

"Q. Did he have some connection with the company? A. No, sir.

"Q. Did he own some stock in the company? A. No. I just asked him to investigate the stock to see what it was worth.

"Q. Was he an accountant or a dealer in securities or something like that? A. Yes. He was a broker.

"Q. You don't recall his name? A. No, not right off.

"Q. Do you have any place where you could obtain his name? A. Yes.

"Q. Would you do that—obtain his name and give it to us? A. I will give you his name.

"Mr. Hankins: That will be handled through her attorneys. She will deliver it to me and I will furnish it.

"Q. (By Mr. Fike) You asked him to investigate as to these stocks? A. That is right.

"Q. And, did he investigate? A. He investigated as far as he could.

"Q. And, did he furnish you a report? A. Yes, sir.

"Q. And, what was that report? A. It is in the hands of my attorney right now.

"Q. Do you recall now what value he placed on the stocks? A. No, sir.

"Q. You don't have any recollection about that value? A. No, sir. It is all down on paper.

"Q. And, that, you furnished to your attorneys? A. Yes, sir.

"Q. It is in their hands? A. Yes, sir.

"Q. You obtained that report, did you not, prior to the time that the divorce was obtained? A. Yes, sir.

"Q. Now, did you make any other investigation as to this stock? A. No, sir.

"Q. That is all that you ever had any information about in reference to the stocks? A. Yes, sir.

"Q. Did you ask anybody in Dalhart or anybody else connected with the company that owned any stock in the company as to the value of it? A. No, sir.

"Q. Did you write to the secretary of the company or the treasurer or the accountant of the company asking them for any information? A. No, because that was supposed to have been handled through my attorney.

"Q. Do you know whether or not they did write? A. I do not know.

"Q. You don't know if they did or not? A. No, sir.

"Q. Did you tell your attorneys to obtain that information for you? A. I did.

"Q. Insofar as you know, they did obtain that information? A. As far as I know but whether it was correct or not, I do not know.

"Q. And, whatever information they obtained, they passed that information on to you, did they not? A. To my lawyer.

"Q. I say whatever information your lawyers obtained, they passed that information on to you, did they not? A. Yes, sir.

"Q. And then, you had that information prior to the time of the divorce and the property settlement? A. That is right.

"Q. Well, I am asking you whether or not you indicated one time that that is what you wanted to do; is take the elevator and the Rural Life Insurance Company stock? A. No, sir.

"Q. You didn't do that? A. No.

"Q. And, when they offered to let you have the elevator and life insurance stock and take other property in place of it, then, you said no, you didn't want the elevator and didn't want the Rural Life Insurance Company stock. Now, isn't that true? A. I do not know. I had so many propositions made that I don't know which were submitted to me.

"Q. Do you recall or have any recollection at all that at one time you said, 'I will take the elevator and the Rural Life Insurance Company stock.'? A. To be right frank, I do not remember saying anything—any certain thing—I would do because there were so many propositions submitted that I don't remember.

"Q. You don't recall whether or not is was agreed to by Carl that you could have the elevator and the Rural Life Insurance stock and he would take other property in place of it of equal value and then you stated you didn't want to do that? A. I said I do not remember. There were too many propositions made, Mr. Fike.

"Q. You do know that there were a number of propositions made? A. Most certainly, there was.

"Q. And, you would make counter propositions to them; he would submit a proposition to you and you would submit a counter proposition. Is that correct? A. Yes, sir.

"Q. And, there were a number of those propositions submitted back and forth before you finally arrived at a final settlement? A. Yes, sir.

"Q. And, yourself, through your attorneys, did make counter propositions, did you not? A. Through the attorney.

"Q. They would submit a proposition to you and you would go over that with your attorneys and you would submit them a counter proposition? A. I really honestly believe he submitted some I didn't know about.

"Q. Maybe so. Who were they submitted to? A. Mr. Glover.

"Q. To whom? A. Mr. Glover, the man with Mr. Russell.

"Q. Were they submitted to your attorneys? A. I suppose they were. How would my attorney know they were submitted; no one else talked to me about it except my attorney.

"Q. Propositions were submitted to you, though, by Carl's attorney? A. That is right.

"Q. People that was working for him? A. Yes, sir.

"Q. And, you would take those up with your brother and with the attorney that was representing you at that time? A. Yes, sir.

"Q. And, you would submit a counter proposition? A. Yes, sir.

"Q. And, that happened a number of times during the time that you were negotiating about the property settlement? A. Yes, sir.

"Q. Now, Mrs. Kuper, when you were trying to determine the values of the property and asking your attorneys to investigate as to the values of the property and Mr. McCrory, while he was working with you, did you ask them to make some independent investigation as to the values of the various properties? A. Mr. McCrory suggested that.

"Q. And, did you do that? A. Yes, sir.

"Q. And, during the time Mr. Miller was representing you, why, you relied upon Mr. Miller determining the values of the property, did you not, to a certain extent? A. Yes, sir.

"Q. Did you have an appraisal made on the property? A. I believe Carl was along the day that Mr. McCrory and—I forget who else went out there—I believe Newton Foster went out and put an appraisal on the land.

"Q. Did you have an appraisal on the property? A. They did and Carl was with them.

"Q. As to the values of the property, you didn't rely on the values that Carl submitted to you as being the values of the property, did you? A. I relied upon that report that Mr. McCrory and Foster and Carl made up.

"Q. You didn't rely upon what Carl told you about the values? A. Now, I am telling you that it was those three men that made that report and Carl was one of them.

"Q. Carl, didn't make that report; wasn't it the appraisers, Mr. McCrory and Mr. Foster, that made the appraisal? A. And, Carl was with them.

"Q. And, you were with them too? A. No, sir, I was not.

"Q. You weren't with them? A. No, sir.

"Q. But, now, Carl didn't submit with those appraisers any report to you; he didn't sign any report to you that that was the value of the land; did he or not? A. I don't know if his name was on that piece of paper or not.

"Q. But, insofar as you were concerned, you were making an independent or having your attorneys make an independent investigation by having these appraisals made and by also you and Lail going to Dallas to find out what the value of the stock was and then asking the man down there to get you a value of that stock; you were relying on that, were you not, as to the values? A. He didn't give me any information when I went down there.

"Q. You said you had a man investigate it and he made a report back to you? A. Oh, the other man?

"Q. Yes? A. Yes, sir.

"Q. And, you were relying on what report you got from him, were you not? A. Yes, sir.

"Q. And, what information you could get from other sources as to the value of this stock? A. Just the one source.

"Q. And, you were not relying on what Carl told you about the value of the stock, were you? A. No."

■ Where Mrs. Kuper had been given proper notice of the divorce suit, had not been prevented from full participation therein, had an opportunity to present her case to the court and to protect herself from any fraud attempted by Mr. Kuper, the fraud, if any, perpetrated under such circumstances is intrinsic. This applies especially where she secured the divorce and had the court to approve the property settlement and a showing that she and her attorneys made investigation as to the value of the property; that she relied upon the report received from the party she secured to make the investigation and, that she did not rely on what Mr. Kuper told her about the value of the stock. This clearly shows appellant was not prevented by any acts of appellee from fully informing herself as to the true value of the stock in question.

Applying the foregoing rules of law, it is apparent that if any fraud was practiced upon appellant herein it was not extrinsic in nature. She secured the judgment for divorce and had the property settlement approved by the court after making her own investigation and was not relying upon any representations made by the appellee. In other words, the appellant was asking the trial court to set aside a judgment that she caused to be entered after she had secured independent information from her attorney and a stockbroker of her own selection as to the value of the stock and not because of any false representations made to her by appellee. We think the case of Bankston v. Bankston, Tex.Civ.App., 251 S.W.2d 768 (mandate overruled) is directly in point here.

Examination of the entire record herein makes it clear, we think, that the summary judgment was proper in this case. Judgment of the trial court is affirmed.